May it please the court, Chief Judge Gregory, Judge Diaz, Judge Harris. I'm Brian Beck of the Federal Public Defender's Office of Abingdon, and I'm happy today to rise to argue the case of James Cox and to make four separate, but I think related, arguments to why Mr. Cox's 600-month sentence for sending five nasty letters was, first, in violation of Dean because it was not parsimonious, second, procedurally improper because it used the wrong guidelines and policy statements, third, procedurally improper because it was based on an insufficient explanation of sentence, and fourth, substantively unreasonable under both Gall and Howard. My arguments here, perhaps it's easiest to understand them if you begin with what guidelines were used and where the guidelines should have began. Mr. Cox was assigned the wrong base offense level of 18 under 2B3.2 instead of 12 under 2A6.1. The reason that's the wrong guideline provision is 2B3.2 deals with extortionary threats, and none of these threats were extortionary in nature. Each of these threats were simply letter threats. Mr. Cox wrote these five nasty letters, three of them from Red Onion State Penitentiary, two of them from the county jail where the Abingdon Court holds clients for trial. Mr. Beck, you twice have described the letters as nasty. Are you contesting that they were not threatening? No. The defendant did concede at his guilty plea that he had made threats, and certainly there are threatening statements made in the letters. To be perfectly frank with your Honor, Ms. Dickinson handled Mr. Cox. I initially began his case, but then Ms. Dickinson took over for me because Mr. Cox enjoyed working with her, I believe, more so than myself. For some reason, we didn't get along particularly well, but at any rate, it's a better today since you're here. I guess so. I guess so. I guess we're getting along better. But at any rate, I can only imagine the look on your co-counsel's face when your client got up and spoke the words that generated the sentence in this case, and I think really that's the focus of the case is what he said in open court that led Judge Urbanski to suggest that he had no choice to impose the and explain why he did that in the context of this defendant, the 3553A factors. And so what I'm suggesting to you is why does any of this matter, given his explanation on the record. It matters because if you're going to properly sentence somebody under the law, you should begin by understanding what the law teaches as to the crime. As the crime of sending threatening letters... I mean, certainly ideally, but isn't this just as clear a case as we could ever get of harmless error, even assuming there was a guidelines error and it looks to me like there was? I mean, this judge was perfectly clear about this. I don't care what the guidelines are. I'm looking for the maximum sentence allowed by law, and that's the one I'm giving you. So what would be the point of that? The point is, then Judge Urbanski would read under 2A6.1, the thing I need to be concerned about are not just whether Mr. Cox is making threatening statements here today in opening court, says he's going to do the conduct that's outlined in the letters. He would look at the language of that guideline and say, well, how likely is it that he will in fact carry out that intent? But he obviously thought it was pretty likely, right? We know that from what he said, that if this guy gets out of prison, he's going to do it. He told me that today, he's going to do it. But Judge Urbanski didn't have the benefit of the guidelines, and the guidelines say, when you look at how likely it is, you should look at whether there was objective conduct, either during the time of the offense or predating the offense conduct that pointed to that the defendant would carry out the offense. And here there is that kind of objective conduct. In fact, the letters, one reason to describe them as nasty but at times not particularly threatening is because they say things which are just silly in the context. Mr. Cox, obviously, he's not a terrorist. I don't know any good terrorist organization that would associate with him. He's not a Satanist, although he describes himself as such. He's somebody who's trying to get attention. Most all of his criminal career has been devoted to trying to get attention for himself in admittedly very negative criminal ways. But with this is my concern about the case, if you can just address it frontally. So I get what you're saying. And on the paper record, it seems plausible. Your account of what's going on here and a 50-year sentence seems really, really long. But I wasn't there, right? The sentencing judge had this guy in front of him stand up and sort of make his case for why he really would carry out these threats. And so that seems like something where we would normally really have no choice but to defer to the person who was in the room and was able to kind of judge this person in the moment in a way that I really can't from the paper. So tell me why this isn't just sort of a classic case for deference to the sentencing judge. Because I think if Judge Urbanski had the correct lens of 2A6.1 instead of 2B3.2, and also Dean, which he didn't have at the time of the hearing, that he would have come to a different conclusion. He would have asked the question, well, do I have objective facts that he's a terrorist? Or he can get grenades? Or he can acquire the things that would do the damage while he's in a maximum security prison? Do I think that's... It wasn't the question in front of him, not whether he will carry this out while he is in prison. But I thought what the judge was Well, yes, I think that was the judge's concern based on the allocution. But my point is that that allocution should point the district court back to the guideline language and also Dean, which Dean definitely teaches parsimony. The guidelines are far lower. There's a statutory max for this Usually, you don't stack statutory maxes. You don't usually stack five of them because there are five nasty letters. I would challenge the court to look at the history of sentencing under this statute. I've not seen a six-hundred... Counselors, did Dean say that you can't stack statutory maxes? No. No, he doesn't. What does it say? It says that you need to look at the guidelines in determining whether there be... No, but doesn't Dean really say in a sense that when you've got mandatory minimums, you can look at that in the context of the other non-mandatory minimum sentence offenses or counts and weigh that and, for example, give very little on the ones where you can go down because these... It's really not seismic in terms of change. It's just saying pretty much almost what you could do anyway, unless somebody was under this notion that, well, no, I've got to give deference to this guideline for this one. I'm giving minimum because they're minimum max. I mean minimum sentences like 15 years here. There's a difference, but tell me why the court would have been better informed had he known or the judge known that the range was 51, I guess, to 71 or something like that. Why would that would have been informed and therefore made a difference in the sentence? Your Honor, both the court would have... That particular guideline is a fraction of what the 100 to 125 month range that was incorrectly used, so it was a smaller fraction of that. Moreover, it would have called the court's focus into the likelihood that Mr. Cox would, would, in fact, carry out those threats once released and the likelihood it was told the court should be viewed in terms of objective conduct. Do you need that? Do you need the mistake in this case to actually make that argument? Was that argument made at the hearing, that this was simply absurd, ridiculous, Mr. Cox never would have followed through on these threats? Ms. Dickinson did kind of make that argument in a sort of way. What she said was she didn't think that these were real true threats, that she thought that they were Mr. Cox looking for help. Right. And so that goes to the nature of the offenses, I guess, the circumstances. So the judge has that in front of him, and then he's got the statements of the defendant saying, oh, yes, indeed, I meant every word, and if I'm released, I'm going to follow through with it. Well, that's right. That's the record that Judge Urbanski had, but I don't think Judge Urbanski was viewing the record through the correct legal lens. And I think in this case, that mattered a lot, because I think if he was looking at, well, you know, first of all, he's making these threats from a maximum security prison, he's not going to do it there. He's making the threats from county jail, he's not going to do it there. If he gets, say, a 10-year sentence, just for example, which would have been above the guidelines anyway, but if he had got a 10-year sentence, the psychologist says that there's a mixed prognosis, meaning that he might recover, he might not recover from psychological care, but at least we're giving the system a chance to work. In other words, we're not predicting failure just because Mr. Cox decided to spout off at the time of his sentencing. And granted, spouting off at a time of sentencing is something not insignificant to the district court and to this court, but at the same time, I don't think that that kind of spouting off should mean that this court should view the prediction that Judge Urbanski made that he would definitely be a threat as necessarily a careful one when it wasn't one that was viewed through the correct legal lens. As a factual question, just, is it the defendant's position that, did mental illness play some role in the... I think so, Your Honor. I think so, in part, he was given psychotropic drugs in the past. He did at some time stop taking the psychotropic drugs. So the BOP in their analysis thought that he was simply, had a personality defect, and that was the cause of all of the conduct. But at the same time, a lot of the conduct was, might be properly described as, if not suicidal, bordering on suicidal, was very self-injurious. He was doing things like slashing his wrist, swallowing cell phones, doing things which a person should know are very injurious to one's health. And in fact, I believe there's a significant history of that, of those kinds of self-injuries, which may respond to treatment. Now, they might not respond to treatment right away, but 10 years of treatment might produce something positive for Mr. Cox, and would give the system a chance to try to come to that solution, rather than simply throwing up our hands and saying, well, he spouted off, so he'll get the sentence that he spouted off about. I don't think Mr. Cox should be, his outburst during his sentence should provide the rule of decision here. I think the law says something different in terms of how threat cases are sentenced, and this court should follow the law, and also another case. I just want to come back to my question, because in reading the sentencing transcript, it seemed like there were, there's this suggestion that there's mental illness at play here, and then there's also the suggestion that I think you already referred to, that this is attention-seeking behavior. It's not a real threat, he's trying to get attention. And then I thought there was also a suggestion that maybe an effort to manipulate his conditions of confinement, that he'd rather be in federal detention. So I'm just trying to get a handle on the defense's position. I think all three of those things might be true at the same time. That he had a serious mental illness, that he was trying to manipulate the conditions of his confinement, and that his acting out was attention-seeking behavior. I think all of those things may be true at the same time. Thank you, Your Honor. May it please the Court, Suzanne Kearney-Quillen for the United States. Your Honors, the United States respectfully requests that the defendant's conviction be affirmed for four reasons. First, the District Court properly considered the 3553A factors when selecting a sentence that consisted of consecutive terms of imprisonment to reach aggregate maximum statutory penalty available. The Supreme Court's decision in Dean did not have any bearing on the District Court's sentencing determination below. Second, even if the District Court applied an erroneous sentencing guideline provision, Cox cannot establish that that error affected his substantial rights. Are you conceding that there was a guidelines error? Your Honor, we would concede that point. We would. The record is clear. We take procedural guideline errors very seriously in the Fourth Circuit precedent. We say you first got to get it right. When you get that wrong, we don't just easily gloss over that. Yes. It's not enough to say, well, you can't prove you've gotten a different sentence. We don't use that rubric, or that metric, I should say, to describe the violence. So why should we do it here, you said, because it wouldn't have made a difference? Yes, Your Honor, and I understand Your Honor's concern. You're saying it wouldn't have made a difference, right? Your Honor, we're saying that the defendant has not satisfied all four prongs that are necessary under the plain error standard. It's plain error? You don't think it's plain error? Your Honor, I would agree that the error is plain, and that it is an error. However, he doesn't meet the third and fourth prongs. He doesn't show that it affects his substantial rights, and he doesn't show that it affects the fairness and integrity of judicial proceedings. And why does it not affect his substantial rights? Your Honor, in previous cases, the courts have been different sentence had the correct sentencing guidelines provision been applied. That is not the case here, because the court elected to impose a non-guideline sentence. Well, one thing is that now, you know, follow me now. It may be a little abstract, but here the district court was sanguine about this thing. Even if I give him the statutory maximum, it's still in the guideline range. That's important, because we look at that, because a lot of things happen, you know. If it's in the guideline range, the different calculus as to how we review it. So how do we know that if he had known correctly that the guideline would depart to do that? But he didn't think, he didn't have to depart at all in his mind, because the range was greater than the statutory maximum, right? 125. That's correct. So he said, wow, I'm in the range. But he wasn't in the range when he gave him the max, was he? Was he? Well, he was not within the guideline range. The correct range, he was, when he gave him the statutory max, in fact, that was, he was not within that range. He actually departed upward, didn't he? Oh, the range. He departed to 500 months. Well, yeah, I know how much he gave him. I'm sorry, the final sentence, 50 years, was or was not within what he thought the guidelines range was. It was not. It was not. No. It was not within the guidelines range, and your honor, that's why. But he's, I'm sorry, he thought the guidelines range was 120 to 125 months. Correct. Total. Or per count. He thought that the guidelines range was 100 to 125. Per count or total? Total. That's what the guideline range was. Okay. Well, total. Yes, that's what the guideline range was, total. And the reason that the district court judge considered that, the sentencing, was because the United States asked for 125 months, which was the high end of the guidelines. Right. And the court noted, in order to do that, I would have to impose a statutory max on each count, plus a five months, and run those concurrently to reach. Wait a minute, in order to give him, in order to give him, what you said, in order to give him 125 months, you'd have to impose the max on each one? He would have to impose 120 plus five months to reach that, reach that 125, and it would have to be consecutive. So he was looking at the total, he was looking at everything? He was looking at that at the time that the United States made its request for a sentence of 125 months. However, he did not consider the guidelines, the guideline range when he ultimately imposed the sentence. And that's why we're arguing that this was not a guideline sentence at all, and this is why the defendant, Mr. Cox, cannot show that his substantial rights were affected, and that's why he does not meet the third prong of the plain error review. The record is clear that the district court would have imposed the same sentence here, regardless of the guideline calculation. You said when the government wanted 125, he said, no, I can't do that because of what? No, he didn't say he couldn't do that. He stated that in order to do that, he would have to impose a statutory max of 120 plus a five months on one of the counts to run consecutively to the 120, to reach the 125. But when he ultimately imposed a sentence in this case, the record is clear that the district court would have imposed the same sentence, regardless of the guidelines calculation. The sentence that was imposed was due to the defendant's criminal history, the need to protect the public in light of the defendant's unequivocal and repeated statements that he intended to kill people when he was released from prison. And the guideline range had nothing to do with the district court's ultimate determination of the sentence imposed. Well, your colleague says, though, that the incorrect guideline would have guided the judge to make a finding or at least have some likelihood that the defendant would actually commit or follow through on these threats. And that that is important because without that guideline, the judge had no understanding of that. What do you say in response? And your Honor, our response to that is that the sentence would have been the same, even with the correct guideline guidance. That the defendant suggests that the court may have thought more carefully about whether or not the defendant could have actually carried through with these threats is not persuasive. There is no evidence that the defendant ever actually carried through any of these threats, is there? There's no proof that he carried through with threats. However, there is proof that the defendant had a high risk of recidivism. There is also proof. Well, recidivism with respect to writing letters and making threats. Well, not only that, your Honor, but within a short period of time after his 2003 release from prison, which was for threatening letters, he reoffended very quickly. Within a I understand that, but there's no evidence of his following through with respect to the threats. With respect to threat letters, no. There is no proof. But there is proof that he did carry this high risk of reoffending again. And when he reoffended in 2003, he attempted to rob a bank and he attempted to do so with a firearm. So there are circumstances here that give the court great concern given the defendant's history and characteristics. This is my question is, the government knew all of this when it first asked for the 125-month sentence, including, right, that the defendant had told the FBI agent, no, I mean it, I will carry out these threats, said to the FBI exactly what he says in his allocution. And at that point, the government thought 125 months was sufficient. But then all of a sudden now the government thinks 50 years is not more than is necessary. So what changed? Your Honor, I made the argument for the 125 months. And I made that prior to the defendant's allocution, which ranged, I'd say, seven to eight minutes. I know, but I'm right, am I not, that he had said the gist of it. I mean, what matters is really the gist. I mean it. These are not idle threats. I will carry them out. Government already knew all of that. He had said that when he was interviewed by the FBI, which is also a time when you would think people would be pretty serious, just like at allocution. So I'm not seeing the new information that got you from 125 months to 50 years. Your Honor, if I had the benefit of what the defendant stated in those seven to eight minutes during his allocution, I would have argued for the maximum that I could have asked for. And what was different about the allocution than what he said to the FBI agent? In person, in the courtroom, Mr. Cox was unequivocal. He was unequivocal to the FBI agent, was he? Did he hedge at all when he talked to the FBI agent? He did not. But again, Your Honor, seeing it, being there in person and hearing him say, quote, I mean what I wrote. When I get out, I will kill these people. That's a promise. It's not over. He went on to say, I'm not going to do probation, Judge. I have always absconded from probation. When I get out of federal prison, I wasn't even out for two or three weeks when I attempted to rob a bank. And then he said, quote, I'm not insane. I would rather be honest. I still plan on doing these things when I get out. I still plan on killing people when I get out. My mind is set. When I get out, I'm going to do this. I'm going to kill a bunch of people. And not only did he reference the people that he'd written the letters to, which during his allocution, he also stated that he had written over 100 other letters while he was pending sentencing that had not even reached the courts. But he also went on to say, and President Bush, former President Bush that I had formerly threatened to kill, when I get out, I'm going to kill him too. I'm going to do everything I can to get to him as well. So being there in person and hearing him reiterate these threats over and over and over for seven to eight minutes, I would have asked for every day that could have been imposed for Mr. Cox. And it's just because sort of like the, this is a genuine question, it's the kind of the emphasis, the conviction he seems to be bringing to it in his allocution struck you as sort of different from what he had told the FBI agent. Absolutely. And I did not have the luxury of being present during his interview by the FBI and DOC investigators, but certainly being there in person and hearing him allocute for such an extended period of time over and over, repeat these threats, again, I would have asked for every day possible. Your Honors, with regards to, again, our position on the guidelines, Mr. Cox has not shown that a different sentence would have been imposed with the correct guidelines range. In addition, Your Honor, in the Supreme Court's case of Melina Martinez, the court has stated there that in cases where an erroneous guidelines range was applied, there may be instances that a reasonable probability of prejudice may not exist and that a reviewing court must consider the facts and circumstances before it in determining whether that error did affect the person's substantial rights. And our position is that this is that exceptional case. This is not a case where the court varied slightly upward or just a small percentage upward. The court here departed upward to the statutory maximum consecutive on each of these counts, each of these five counts. This is that exceptional case where the defendant cannot show that his substantial rights were affected. He cannot demonstrate that a different sentence would have been imposed and he cannot show that the error affected the fairness or integrity of the judicial proceedings. Moving on, Your Honors, to the procedural explanation that was given for the 50-year sentence. Again, Mr. Cox fails to show that there was any error in the sentencing. He fails to show that the court failed to provide a procedurally proper statement of sentence when, in fact, the court did clearly explain all of that on the record. As the joint appendix references on pages 200 to 204, the court did conduct an extensive explanation of all that it was required to do. As Your Honors know, the courts must consider the 3553A factors, the court must adequately explain the sentence, conduct an individualized assessment, and must also provide a complete detailed explanation, particularly where there is a major departure. Is it fair to say that in this instance, Judge Urbanski focused almost exclusively on the need to protect the public from future crimes? Your Honor, we don't believe that he focused exclusively on that. The record, in fact, shows that he went through all the factors in 3553A. He stated on the record that the defendant had an extensive criminal history. He stated that the defendant had been engaged in criminal conduct his whole life. He noted that the defendant had a high risk of recidivism based upon the fact that he reoffended so quickly after the 2003 release from prison. He then also noted and turned to the letters. He noted that the defendant had written numerous letters, not just the five that he was charged with, but as the defendant admitted in the sentencing hearing that day, hundreds of letters that had not even reached the court or its intended recipients. The court noted the very serious nature of the offense. The court noted that these weren't nasty letters as have been any non-frivolous mitigation factors to be considered by the court? There's no one mentioned, right? I'm sorry, Your Honor. Any non-frivolous mitigating factors for sentencing? Your Honor, as Mr. Beck noticed or mentioned today, Mr. Cox's counsel at sentencing did note that it was felt that these letters were just simply seeking attention and an attempt to... He talked about mental illness, didn't he? He did talk about mental illness. And what did the court say about that? Well, the court found that the defendant was competent to proceed at that time. The court had the benefit of not one but two psychological evaluations that found the defendant competent. And in those psychological evaluations, one counselor even noted that it may have been... But the court didn't find any non-frivolous mitigating factors in every document? No. But wait a minute, you've seen these letters. Some of the letters, I mean, I don't want to go through all of them because they're horrible. But some of them, after the argument, he wanted to eat his brother. I mean, he wanted to kill his mother. He wanted to take skin off people and wear the skin around as a mask. I mean, I don't think you need a psychologist to say something is wrong there. I mean, the letters are just... They're not only just letters. I did, Your Honor, and I saw that one was... You don't think that one would reasonably come to the conclusion that this person is sick. I don't care what the psychiatrist... I'd like to cross-examine that psychiatrist who said, oh, no, he looks fine to me. He's well balanced. I mean, you can't lose sight of some common sense in these cases. I mean, clearly, he must be some mental illness. But as a matter of fact, for example, the federal judge was assigned to your case. Before the judge can do really anything in the case, you write a letter to the judge saying, I'm going to kill you. That's right, I'm going to kill you. And that's why he has Judge Orbanski rather than the first judge. That is some indication of some sickness, isn't it? Well, Your Honor, the psychological evaluations did not say that Mr. Cox was a well-balanced person. They noted that he did have some problems that appeared to be able to be helped with medication and noted that he had been assisted in the past. Why does the judge note that? That's a non-frivolous mitigator. Why is that not mentioned? The judge talked about everything negative, didn't say anything that might say, you know, this person is sick. Maybe if someone helps him, he gets something. I mean, unless you say it was frivolous, you would say based on that report, it would be frivolous to say that's a mitigator in terms of mental illness. That's your argument? No, Your Honor, I'm saying that the court had the benefit of those examinations and prior to imposing... We can't read the judge's mind, so we don't know whether he considered it. And in this record, I'm saying if that's a non-mitigating factor, for example, to say, I saw that, maybe it's wrong, but I dismissed that because I think he's malingering or whatever, and I'm discounting it. I didn't say you have to conclude that that's as positive as it gets less, but we require so we can have a meaningful review that the court considered it. And I'm asking you, where in the record does he consider the non-frivolous mitigating factors of mental illness, which is indicated, I think, for most people, it was any common sense, that he had those letters, that something was wrong there. Absolutely, Your Honor. I understand and I agree that Mr. Clark certainly has some limitations. What's your response to my question? The court not mentioning the common... Your Honor, in the scheme of how this hearing actually transpired, at the outset, the court considered the psychological evaluations. At the very beginning of this hearing, it was actually a psychological competency hearing. During that portion of the hearing, the court concluded that while the defendant may have had psychological limitations with regards to mental illness and things like that, he noted that he was being treated. However, he felt that the defendant was competent to proceed at that time. And he said the same thing. He said the same thing at the elocution when he explained the sentence, but to the Chief's questions, he never really balanced that issue from the separate issue of whether or not he had some mental health issues, which obviously he did, that impacted the offenses in some way. And I understand Your Honor's concerns on that. He did not specifically reference the psychological evaluations during the actual sentencing portion of the hearing. That is correct. He did not. Can I say why that's doubly concerning to me? To the extent that the judge... This is what I am concerned the judge was thinking. He's got some mental issues, and as far as I'm concerned, that makes it all the more important that he be incapacitated for as long as possible. And that seems to me, if that's what the judge was thinking, that seems problematic because that's what civil commitment is supposed to be for, that you give someone the right sentence, and if at the end of that sentence they still are sufficiently mentally unwell that they need to be not returned to the public, then you go through the procedural protections of the civil commitment system. And so the fact that he wasn't sort of... That we have no indication of what the judge thought about the mental illness strand of this case makes me nervous. Like it might have been a real mistake that he just sort of overlooked the whole civil commitment alternative. And I understand your Honor's concern with regards to that. However, in looking at the record in its entirety with regards to the sentencing portion, the court did not exclusively focus on just the statements of the defendant made in court that day. Rather, he went through an entire consideration of the other 3553A factors about his extensive criminal history, that he'd been engaged in criminal conduct his whole life, the fact that he reoffended so quickly, the number of letters that were involved in this case, the threatening nature of those, and he also said, Judge Urbanski said, quote, the defendant's history and the offense conduct established him as a danger to the community and prior periods of incarceration have not proven to be any deterrent, any deterrent to his continued dangerous conduct, nor has he demonstrated any remorse for his crimes. Only after that, did the court, after going through that entire consideration of the 3553A factors, did the court say and at that point, the defendant has indicated today, in plain terms, that if he's released from prison, he will go out and kill people. So only at the end of that discussion, after considering everything else, did the court even comment on the statements the defendant made in court that day. And so, Your Honors, in summary, we believe that the court, even if the sentencing guideline calculation was incorrect, that the sentences imposed is still procedurally reasonable and substantively reasonable. Thank you, Your Honors. May it please the court, I'm glad to have listened to that past exchange because it brings me back to what I think should be a proper focus for this court. The mitigating aspect of the sentencing factor. And was it argued? It was only argued in the general sense that Ms. Dickinson said that the letter conduct were cries for help. And as well as the fact that there was an ample record at that point that I think just a short time before sentencing, Mr. Cox had swallowed a cell phone and had been, while he was in the mental health treatment of the BOP, was slashing his wrists, as well as the fact that he was writing the previous letters to Judge Jones, which were intentionally damaging to himself. I understand that there was record evidence, certainly on the cell phone thing, and I think the psychological reports, I can't remember, it was the borderline personality disorder. But what I'm trying to get my hands around is whether the defense lawyer at sentencing said, listen, mental illness is a mitigation factor here. You need to take it as an answer. Ms. Dickinson didn't expressly say that. What she said was, these letters written by the client, the ones that he stands convicted of, were cries for help. But it was really in the context of saying, he's not going to carry these things out. These are not serious threats. No, no. And I think the way you determine that is, first of all, you have to think when you're, that's why I think that the lens of looking at a future civil commitment is helpful, because then it brings the district court judge to the, back to the focus. Well, okay, if we give this man a proper guideline sentence, maybe a high guideline sentence, maybe a slightly above guideline sentence, if we give him something like that, that will give him time for the BOP, who has a mixed prognosis as to his case, to work out his treatment and maybe the mixed prognosis will turn to the good. He'll receive some beneficial mental health treatment and he'll walk away from the BOP after, say, 120 months and not pose a threat. Maybe he'll be good on supervised release, because we know he'll be on supervised release when he's released, and then at that time, the probation will get to follow up on his care. Mr. Beck, may I just follow up with respect to this issue that Judge Harris raised? Because I believe, although it wasn't an extensive argument by your co-counsel, she did tell the court, in fact, ask for downward variance based on the fact that Mr. Cox had suffered from mental illness for most of his life, she said. And she also suggested that he had not received adequate mental health treatment while incarcerated. It seems to me that that's enough, at least, to put the court on notice. Yes, Your Honor. I do think that puts the court on notice, as well as the cry for help argument that she made separate from those comments. So, I do think those were sufficient to call the court's attention to mental health and to make that mitigating factor. One aspect... Mr. Beck, may I ask you this question? Yes. It seems like a big hurdle you have, Your Honor. The question I have is how you respond to it is, you know what sandbagging is, right? You're not allowed to sandbag the court. He gave him the sentence that he asked for, the exact sentence, the number that your client mentioned. He said, you know, you'll need the 50 years. I need to be in here. I'm going to be a threat and I'm going to do it. I mean, he gave me all those things. He said, okay, I'm going to relieve you of your, you know, whatever, and I'm going to give it to you. Well, how do you get around that? I'll respond to that by saying, after you read this record... You mean, are you presuming that I haven't? Oh, no, no, no, no. No, I'm sorry, Your Honor. I thought you said... No, no. You said, after I read it. No, no. What I'm saying... No, no, no, no, no, no. I didn't mean... I didn't mean it. What I meant to say is, on this record, when one looks at what Mr. Cox said in terms of threatening, when he says, I'm going to carry out a threat, you should believe the exact opposite. I think he's... But he's also a person that took a gun into a bank and said, give me the money or I'm going to blow, and the expletives will follow. I know the record very well. He does carry through something very demonstrably. When you say he took a gun, he was convicted under a statute which allows a replica gun. That's right. So maybe he took a... Maybe somebody holding a plague under your head and said, give me the money. No, no. I'm not saying any of that. I didn't think he would. No, I don't think that. And he got a long sentence for that out of the state who took him. The judge has tried to sentence him for what he might do, and he made it clear what he will do, not might, but will. And you need to give me these 50 years. I'm just saying, what are we to do with that? I think you say that that very conduct is... It demonstrates the mental illness of which Mr. Cox needs treatment. So it feeds into the same argument, right? Right. That is the argument I think you're on. All right, go ahead. I'll let you know. I'm ready to finish up. I'll give you 30 seconds to finish up here. Okay. No, I think the question was well put. So overall, I think Mr. Cox, who is severely mentally ill, whose wrong guidelines were used, whose guideline calculation misread the policy statements, gave him an enhanced guideline sentence. That man should get a who knows that the mental health history has to be part of the sentence imposed. Thank you. Thank you, counsel. We'll ask the clerk to adjourn court until 8.30 tomorrow morning. Then we'll come down and greet counsel.
judges: Roger L. Gregory, Albert Diaz, Pamela A. Harris